| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. SAG-25-324** |
| | ) | |
| **DALYA ATTAR,** | ) | |
| **JOSEPH ATTAR,** | ) | |
|     a/k/a "Yossi Attar," | ) | |
|     a/k/a "Jay Attar," and | ) | |
| **KALMAN G. FINKELSTEIN** | ) | |
| | ) | |
|     **Defendants.** | ) | |
| | ) | |

## GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS DALYA ATTAR, JOSEPH ATTAR, AND KALMAN FINKELSTEIN'S PRE-TRIAL MOTIONS

The United States of America respectfully submits this Omnibus Opposition to the following motions filed by Defendants Dalya Attar, Joseph Attar, and Kalman Finkelstein in this matter:

1. Defendant Dalya Attar's Motion to Dismiss Counts Two, Three, and Five of the Indictment (ECF No. 45), joined by Defendant Joseph Attar (ECF No. 56), and Defendant Kalman Finkelstein (ECF No. 65);

2. Defendant Joseph Attar's Motion to Suppress Cell Phone Evidence and Request for Hearing (ECF No. 57), joined by Defendant Kalman Finkelstein (ECF No. 65);

3. Defendant Joseph Attar's Motion to Suppress Evidence Obtained through Coercion and Request for Hearing (ECF No. 59), joined by Defendant Kalman Finkelstein (ECF No. 65); and

4. Defendant Kalman Finkelstein's Motion to Suppress Evidence, Request for Hearing, and Request for *Franks* Hearing (ECF No. 67) (collectively, the "Motions").

For the reasons outlined below, the Defendants' Motions are meritless and should be denied.

# TABLE OF CONTENTS

I. REQUEST TO EXCEED PAGE LIMITATION.................................................................... 3

II. BACKGROUND .................................................................................................. 3

    A. Factual Background ........................................................................................ 3

    B. Procedural History ........................................................................................ 13

III. ARGUMENT ...................................................................................................... 14

    A. Dayla Attar's Motion to Dismiss ................................................................. 14

        a. Extortion Does Not Require a Transferable Property Interest....................... 15

        b. The Travel Act is Properly Charged ............................................................. 21

    B. Joseph Attar's Motion to Suppress Cell Phone Evidence................................ 24

        a. The OSP Warrant was Sufficiently Particularized and, Even if it Were Not, the Good Faith Exception Applies ......................................................................... 25

        b. OSP's Search of Joseph Attar's Digital Device was Reasonable ................. 33

        c. The Federal Warrant is Not Tainted by the OSP Warrants .......................... 38

    C. Joseph Attar's Motion to Suppress Evidence Obtained through Coercion....... 44

    D. Kalman Finkelstein's Motion to Suppress Evidence .................................... 48

        a. The Marital Communications Privilege Does Not Apply ............................. 49

        b. The Warrant is Not Overbroad, Unparticularized, or Tainted ..................... 56

        c. Finkelstein is Not Entitled to a *Franks* Hearing ......................................... 60

# I.     REQUEST TO EXCEED PAGE LIMITATION

The Government responds to four filings in this single response, which required the Government to exceed the 35-page limit in Local Rule 105.3. The Government requests permission to exceed the page limit rather than separate this single filing into four separate filings.

# II.     BACKGROUND

## A.     Factual Background

The Indictment in this case details a brazen extortion scheme committed by Maryland State Senator Dalya Attar along with her brother, Joseph Attar, another close associate who worked as a Baltimore City Police Officer, Kalman Finkelstein, and several other unnamed co-conspirators. As the Indictment lays out, Dalya Attar appears to have been fixated on the damage that could be done to her by Victim 1, a former member of Dalya Attar's 2018 campaign for the Maryland House of Delegates who had an acrimonious split before Attar's win in that election. Investigation by the Maryland Office of the State Prosecutor ("OSP") began with a complaint from Victim 1 in December 2021, after Victims 1 and 2 were threatened with the revelation of their affair if they did not comply with Defendants' demands.

The origin of the criminal conspiracy began in at least January 2020, when Dalya Attar sent a series of WhatsApp messages to another co-conspirator stating, in relevant part:

> 2 years later [Victim 1] is still looking to screw me badly . . . I just want her to be a non-issue in my mind and in reality that won't happen as long as she is relevant or doesn't have anything to worry about . . . Because I believe she's building things up, even small things, but in the end when it's the right time for her (close to re election), it'll come out . . . And even more reason why the lady should be afraid to come out with anything at any point.

Indictment ¶ 13a, ECF No. 1. This statement demonstrates Dalya Attar's fear that Victim 1 was "building up" damaging information that would "come out" close to Dalya Attar's re-election that

could "screw [Dalya Attar] badly." *Id.* Dalya Attar further concluded that there was reason why Victim 1 "should be afraid to come out with anything at any point." *See id.* Dayla Attar's fear and dislike of Victim 1, expressed by her in messages throughout the course of the conspiracy, appears to have served as the primary motivation for the crimes that followed. The Government has not yet identified evidence, nor has Dalya Attar produced sufficient documentary support for the claim in her motion at ECF No. 45 that Victim 1 engaged in "ongoing and well-documented stalking, harassment, threats, and demands." *See* ECF No. 45 at 3. Of note, Victim 1 spent most of her time in Israel, not Maryland. *See* Indictment ¶ 5.

Joseph Attar and Kalman Finkelstein, in addition to their typical employment, assisted with Dalya Attar's election campaigns. *See id.* ¶¶ 2–3. At the time, Finkelstein's wife and Victim 1 were close friends and shared a great deal of personal information with each other. This relationship also granted Finkelstein intimate access and knowledge about Victim 1's whereabouts. *See id.* ¶¶ 13c, 13d, 13i. Whether the co-conspirators knew definitively that Victims 1 and 2 were having an affair, or whether they had merely heard rumors and suspicions, the evidence demonstrates that Joseph Attar and Finkelstein communicated via WhatsApp in early January regarding their plans to follow Victim 1 when Victim 1 traveled to the United States from Israel from January 13-22, 2020. *See id.* ¶¶ 13b, 13c. Finkelstein knew that Victim 1 would be staying in the apartment of Finkelstein's son, who was himself out of the country. Joseph Attar, Finkelstein, and two other co-conspirators coordinated to place a tracking device on the vehicle Victim 1 drove—a vehicle owned by Finkelstein's nephew. *See id.* ¶¶ 13d–13f.

By January 15, 2020 at the earliest, the co-conspirators crystallized a plan to bug the apartment in which Victim 1 was staying, and they settled on a recording device disguised as a smoke detector. *See id.* ¶¶ 13g–13h. On January 16, 2020, Victim 1 babysat Finkelstein's children,

including taking them to Rita's for frozen custard. Finkelstein used this as an opportunity to report Victim 1's whereabouts so that other co-conspirators could sneak into the apartment and install recording devices. *See id.* ¶ 13i. That same day, Joseph Attar created a voice message on WhatsApp stating as follows:

> Yes, we got all the units working, got the double-sided tape on it, all that kind of little crap. Got it connected, tested them and all that. Now I'm on my way there now to go and pick the lock and try to get in.

*Id.* ¶ 13j. Later that day, Joseph Attar and other co-conspirators entered the apartment where Victim 1 was staying and installed a recording device in the living room and a recording device in the bedroom. *Id.*

Defense counsel correctly note that the Government does not have possession of the audio and video that was recorded from the Defendants' smoke detector cameras, though as will be discussed, there is plenty of evidence that the recordings were made and used by the Defendants. This evidence includes audio recorded by Victim 2 of Joseph Attar showing a clip of a video by Joseph Attar during his extortion attempt. Because the Defendants' videos were either deleted or placed out of reach of search warrants, the Government does not know exactly how many videos were taken. However, the recording of the affair between Victims 1 and 2 likely began on January 16, 2020, when the Indictment details Finkelstein created a WhatsApp voice message stating, "Damn, I wish I had [Victim 2's] stamina." *See id.* ¶ 13k.

Dalya Attar, who at this time also worked as an Assistant State's Attorney with the Baltimore City State's Attorney's Office, was concerned with the existence of documentary evidence of the crime. *See id.* ¶¶ 13l, 13t, 13ee, 13hh. For example, the following day, she sent a WhatsApp message to Joseph Attar, Finkelstein, and the two other co-conspirators who had assisted in the installation of the camera that stated, "No further convo please re[garding] getting

in. I told everyone on the group how we got in. Thanks." *Id.* ¶ 13l. Finkelstein dutifully wrote to the same group, "Everyone delete anything from that group that you can now." *See id.* ¶ 13m.

Victim 1 remained in the United States for several days, during which Victim 1's whereabouts were monitored by Dalya Attar, Joseph Attar, Kalman Finkelstein, and another co-conspirator. *See id.* ¶¶ 13n–q. This may well have included additional recorded footage of Victims 1 and 2 from inside the apartment, as evidenced by Joseph Attar's messages to the group on January 21, 2020 stating, "Shes in the house now…" and two hours later: "We have a visitor…" *See id.* ¶ 13r.

The above-described events took place in late January 2020, after which the conspiracy went somewhat silent, likely due to the COVID-19 pandemic that began to grip the world in March 2020 and continued long after. Another factor could have been that Dalya Attar was not up for re-election until 2022, coupled with her stated fear that Victim 1 would release information close in time to Dalya Attar's re-election. *See id.* ¶ 13a. Regardless, the evidence demonstrates that Dalya Attar was intimately involved with decision-making regarding the use of the video to extort Victims 1 and 2. On March 11, 2021, she sent a series of WhatsApp messages to Co-Conspirator 1 stating, "[Victim 1] needs to be warned before mailers to the Jewish community start coming out about things I've voted on in the last 3 years. We're nearing my election. We can't wait until she does it already. Things as simple as anti police things . . . She wants her daughters to get married more than she wants to screw me . . . There's the perfect way to scare her re[garding] her daughters shidduchim . . . Each mailer can do a lot of damage. We have a way that can potentially stop her. Why not at least try." *Id.* ¶ 13s.

Again evidencing her desire to keep her hands clean, when Co-Conspirator 1 responded, "when you have time, you, me and Yossi [Joseph Attar] should work on the plan," Dalya Attar

stated, "I am not working on any plan :) . . . I don't even know what you're talking about." *See id.* ¶ 13t. As the co-conspirators knew, Victim 1 was a "shadchan," which is a Jewish professional matchmaker. *See id.* ¶ 9. Victim 1 also had concerns for the "shidduchim," or matchmaking, of her daughters. *See id.* ¶¶ 9, 13s. The revelation that Victim 1 had an affair could be extremely damaging to Victim 1's work as a shadchan and to Victim 1's daughters' prospects for marriage.

On March 26, 2021, Dalya Attar sent a WhatsApp message to Co-Conspirator 1 containing a link to an article she claimed Victim 1 authored under a pseudonym, to which Co-Conspirator 1 replied, "is that her best shot?" *Id.* ¶ 13u. Dalya Attar responded with two voice messages on WhatsApp stating:

> I don't know why we're not preempting it because we have a way to preempt it . . . I think we have a very, very easy on our end, simple way to very likely get her to just shut up and leave us alone . . . She's a smart lady and she knows how to screw with people . . . So, she has no reason to back down and to not screw with me, yet. If she has reason, the only thing she worries about are her kids and I'm not—I'm not saying we actually go after her kids but at the same time telling her that we have this information—she's worried about her kids' shidduchim. So, I'm not saying we leak this anywhere or we ever do that, but I'm saying we warn her with that, if you do go ahead and screw with me, we are gonna leak it. And she has to understand also that an article like this, obviously she's gonna say it wasn't her it wasn't her. Well, you know what? Maybe it wasn't her, but we don't care because we think it was her and that's enough for us to leak it.

*Id.* ¶ 13u.

Dayla Attar's seat on the House of Delegates was up for re-election in 2022, with the Democratic primary in June. Dayla Attar officially filed for re-election on December 6, 2021. *Id.* ¶ 13w. On November 30, 2021, she sent a message to Joseph Attar and Co-Conspirator 1 stating, "If that video really exists, it'll be really helpful now," to which her brother replied, "I will schedule the meeting." *Id.* ¶ 13v. One week later, on December 6, 2021, Joseph Attar sent a message to Victim 2 requesting a meeting and stating that he "[w]anted to discuss an opportunity" with Victim

2. *Id.* ¶ 13w. He then sent a screenshot of the calendar appointment of his meeting with Victim 2 to Dalya Attar, who responded, "Have fun," and "Be smart please." *Id.* ¶ 13x. Joseph Attar also sent a screenshot of the appointment to Kalman Finkelstein. *Id.* ¶ 13y.

On December 7, 2021, before meeting Victim 2, Joseph Attar sent a WhatsApp voice message to Dalya Attar stating:

> Do you have anything in your phone from that whole situation? Any videos or pictures or anything like that? I remember we were sending stuff out. Do you have any of it?

*Id.* ¶ 13z. Dalya Attar responded, "No nothing." *Id.*

Victim 2 was understandably confused and concerned as to the purpose of the meeting when he was contacted out of the blue by Joseph Attar to meet at the Greenspring Shopping Center.[1] As a result, Victim 2 decided to record the audio of the conversation using a function on his phone.[2] On that recording, Joseph Attar makes the following statements, among others:

> (i)   I have hours of footage of you in bed with [Victim 1] . . . hours.
>
> (ii)  Here's what I need you to do for this to go away permanently . . . So, the only thing you need to do is very simple, is go to [Victim 1] and say to her, listen, leave Dalya alone. Don't bring her up anymore to anyone. Stay out of this election, the Delegate election. And make sure she doesn't do anything against Dalya throughout this election . . . or I'll share this video with everybody you know, everyone she knows, every Rabbi in town, your kids, your wife, her daughters. I have all her daughters' numbers in the phone if you want to see that too, right? I already have all her daughters' phone numbers, right? And every shadchan in Israel who is trying to set up her daughters, I'll share these videos with.
>
> (iii) I have to protect my family . . . You can go to [Victim 1]. You can go to [Victim 1], and say [Victim 1], leave Dalya alone, for my sake and for your sake, leave Dalya alone. That's all I want. That's it. I'm not asking for much. Stay out of the race and make sure no article comes out.

---

[1] Joseph Attar also brought another individual for protection, who he sat at a table next to them and referenced during the meeting when Victim 2 stood up.

[2] Case law establishes that the audio Victim 2 made of Joseph Attar committing extortion is admissible in this federal prosecution. *See United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (citing *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994)); *United States v. Blank*, WDQ-14-0448, 2015 WL 4041408 (D.Md. 2015).

Indictment ¶ 13aa. During the meeting, Joseph Attar used his cellphone to show Victim 2 a recording containing both audio and video of Victims 1 and 2 in bed together. The recording captured by Victim 2 contains audio from Defendants' recording, as well as Joseph Attar identifying the voice of Victim 1, so even though the Government does not have the original recording, it has physical proof of its existence.

The meeting concluded at approximately 10:48 am. At 10:50 am, Joseph Attar sent a WhatsApp message to Victim 1 stating, "I suggest you have a conversation with [Victim 2]." *Id.* ¶ 13bb. He then made a series of calls to Finkelstein and Attar. *Id.* ¶ 13cc. Meanwhile, Victim 2 conveyed the threat to Victim 1, as Joseph Attar had demanded.

On December 12, 2021, at 2:58 pm, Joseph Attar sent Victim 2 a WhatsApp text message that stated, "Will requests be satisfied?" *Id.* ¶ 13dd. At 5:52 pm, Victim 2 responded: "I already told her. I did what you asked. There's nothing else I can do. [Victim 1] has already indicated multiple times that she is not involved in any activity that could or would harm Dalia [*sic*]. She has no intention of harming her in anyway either. You have everything you asked for. Put it to bed. Leave me the hell alone." *Id.* ¶ 13dd. At 5:56 pm, Joseph Attar sent a WhatsApp message to Dalya Attar that he subsequently deleted. Dalya Attar responded with a series of WhatsApp messages stating, "Why did he text that. Did you text him first? . . . Do not text him back . . . He's trying to get you to put something in writing." *Id.* ¶ 13ee. On December 29, 2021, Finkelstein sent a WhatsApp message to Dalya Attar stating, "Maybe we can push [Victim 2] one more time." *Id.* ¶ 13ff.

On April 8, 2022, approximately two months before Dalya Attar's primary election, Victim 1 made a post on Facebook that included an article about a Maryland Legislature amendment vote, with a caption questioning why certain Delegates voted against the amendment. *Id.* ¶ 13gg. Dalya

Attar sent a WhatsApp message to Joseph Attar and Co-Conspirator 1 containing a screenshot of Victim 1's post and stated, "Looks like she wants the world to know about her and [Victim 2]." Dalya Attar also stated, "She needs to know we're serious." Later, Dalya Attar stated, "Regardless, she and [Victim 2] need to know we're serious. It's time to show it to someone that'll get back to her." *Id.* Joseph Attar responded by saying "I'll text her something," to which Dalya Attar wrote, "No don't text her . . . Not one text. Someone like [Finkelstein's wife] needs to be shown the video and told something like if she continues, more people see it. And then you need to see [Victim 2] in person and simply tell him so far one person was shown the video and if it continues, it'll be spread . . . Do not have anything in writing or recorded with [Victim 1] or [Victim 2] any further." *Id.* ¶ 13hh.

The same day, Co-Conspirator 1 sent a WhatsApp message to Dalya Attar and Joseph Attar that stated, "you can't send the video to anyone. It will give her an opportunity to get in front of it. If you decide you want it known, it has to be shown not sent. Would you mind waiting until after April 15th?" *Id.* ¶ 13ii. Dalya Attar responded, "I agree- shown. And no I don't mind." *Id.* Minutes later, Dalya Attar sent a picture of [Victim 2]'s home and car and wrote, "He's home. Maybe I should just knock on the door and tell him." *Id.* Co-Conspirator 1 responded, "it shouldn't come from you." *Id.* Dalya Attar continued in a WhatsApp message to Joseph Attar and Co-Conspirator 1, stating, "Her post didn't get any traction so this one is not a big deal . . . I just don't want her to get comfortable and start posting again." *Id.* ¶ 13jj. Co-Conspirator 1 responded, "I think we should just leak the fact that there is a video. Let her suffer a little for her post. Only [Victim 1] and [Victim 2] know it exists. They can't deny it. We show it when we need to show shock and awe." *Id.* Dalya Attar responded, "Fine with me as long as it's leaked to the right person." *Id.*

Later on April 8, 2026, Dalya Attar sent Co-conspirator 1 a series of voice messages on WhatsApp stating, in part:

> I really think you should talk to [Joseph Attar] about a smart move . . . Like, like I really, really think that we need to respond to [Victim 1]. Whether it's through [Victim 2], I personally like the idea of [Joseph Attar] physically showing the video to [Finkelstein's wife] because it will obviously get back to [Victim 1] and [Joseph Attar] would leave a message saying, you're the first person I'm showing it to, it's going to continue if anything again is posted . . . I don't care, maybe it'll ruin their relationship, that I don't care. I just wanted it to get back to [Victim 1] and if not [Finkelstein's wife] then someone else. Like, I personally don't think [Finkelstein] would like the idea of using [his wife], well I know he won't like it, but at this point, I have an election coming up and I really don't care. I just care about it getting back to [Victim 1] and she understands that we're serious, not another little threat or something like that, she needs to understand we're serious.

*Id.* ¶ 13kk. She continued:

> We have one big bullet, and that bullet can be split into pieces, so if we show [Victim 1] a warning that we're willing to show the video, we're not afraid to show the video. It will scare [Victim 1]. Obviously going to one person who she's close with and to say, we're only sharing this with you right now, but if you continue it'll get spread more and more and more. I don't think that's using our bullet, I think that—I don't think it's using it up.

*Id.* ¶ 13ll. Later that day, she sent Co-Conspirator 1 a WhatsApp message stating, "[Finkelstein] is fine with us showing [Finkelstein's wife] . . . I think it may still help cuz [Victim 1] would see we're showing it." *Id.* ¶¶ 13mm.

On June 28, 2022, Joseph Attar engaged in a lengthy text conversation via WhatsApp with Victim 1, who at the time was in Israel. During that conversation, Joseph Attar made the following threats, among others:

> (i)      I wonder what daughters and son in law and shadchans in Israel trying to set up the rest of your daughters [*sic*] would like to see videos that were shared with me.
>
> (ii)      So you really want to go down this road?
>
> (iii)      It's not a threat nor it is illegal, but be certain, it will happen.

(iv)    I have another idea. We each go our own way and neither talk about each other or our families to anyone. I much rather this route than other routes that no doubt will hurt your daughters shidduchim.

(v)     Please don't underestimate me.

(vi)    We will talk when you get here. Come as soon as you can. . . . You can make a vacation out of it . . . It can be after [the elections], I just suggest that until then, you take me up on my offer . . . Highly suggest.

(vii)   This is probably the best decision you can make in your lifetime.

(viii)  Really hope you make the right decision. You gain nothing by making the wrong decision and you lose a ton by making the wrong decision. Do the right thing.

(ix)    You have nothing to worry about if you accept my offer.

(x)     The smartest decision you can make in your life, is to accept my offer.

(xi)    Just leave my family alone and nothing will ever come out.

(xii)   Put me to the test. I dare you.

(xiii)  I'm not going to hurt anyone. I said I was going to visit your mom, a family friend, just to share some information she may want to know . . . No one threatened anyone . . . Actually, that she may not want to know.

On January 31, 2022, the Honorable Ruth Ann Jakubowski of the Circuit Court for Baltimore County, Maryland authorized search warrants for information stored in Joseph Attar and Finkelstein's respective Google accounts. *See* ECF No. 67 ["Finkelstein Mot."], Exhs. 6, 3. The warrants were executed that day.

On July 15, 2022, Judge Jakubowski authorized warrants to search Joseph Attar and Finkelstein's respective persons, homes, and cellular devices. *See* Finkelstein Mot., Exhs. 8, 9. Then, on March 20, 2024, Judge Jakubowski authorized new warrants for Joseph Attar and

Finkelstein's Google accounts. *See id.*, Exhs. 13, 15. The investigation was later adopted by the United States. On October 7, 2025, the Honorable Erin Aslan, United States Magistrate Judge, authorized search warrants for Joseph Attar and Finkelstein's Google accounts. *See id.*, Exh. 23. Then, on October 10, 2025, Judge Aslan authorized search warrants for Joseph Attar and Finkelstein's cell phones and the target data that had previously been extracted from the phones. *See id.*, Exh. 24.

**B.      Procedural History**

On October 23, 2025, Defendants Dalya Attar, Joseph Attar, and Kalman Finkelstein were charged in an eight count Indictment with Conspiracy in violation of 18 U.S.C. § 371, Extortion via Interstate Communications in violation of 18 U.S.C. § 875(d), Interception and Disclosure of a Wire, Oral, or Electronic Communication in violation of 18 U.S.C. 2511(c) and (d), and Travel Act violations in violation of 18 U.S.C. § 1952(a)(3) and (b)(2). *See* Indictment. On October 30, 2025, Defendants had their initial appearances on the Indictment. *See* ECF Nos. 16, 20, 23. Defendants were arraigned on November 24, 2025 and entered pleas of not guilty. *See* ECF Nos. 38–40.

On December 11, 2026, Defendants filed a Consent Motion for Extension of Time to file Pretrial Motions, requesting an extension until January 19, 2026, which the Court granted. *See* ECF Nos. 43, 44. Defendants filed another Consent Motion for Extension of Time to File Pretrial Motions on January 12, 2026, seeking an extension until February 20, 2026, which the Court granted. *See* ECF Nos. 46, 47.

On December 16, 2026, Dalya Attar filed a Motion to Dismiss Counts Two, Three, and Five of the Indictment. *See* ECF No. 45. On April 1, 2026, Joseph Attar joined the Motion to Dismiss (ECF No. 56) and filed a Motion to Suppress Cell Phone Evidence and Request for

Hearing (ECF No. 57) and a Motion to Suppress Evidence Obtained through Coercion and Request for Hearing (ECF No. 59). On April 2, 2026, Finkelstein filed a Motion to Suppress, Request for Hearing, and Request for *Franks* Hearing. *See* ECF No. 67. On April 15, 2026, the Government filed a Consent Motion for Extension of Time to file its responses to the Defendants' motions, which the Court granted. *See* ECF 74, 75.

### III. ARGUMENT

**A. Dayla Attar's Motion to Dismiss**

Defendant Dayla Attar's motion to dismiss, filed long before the other Defendants' motions but nonetheless joined by them, is comprised largely of unsubstantiated allegations attacking one of the two victims in this case that have no place in a motion to dismiss filed at this stage in the proceeding. The audience for much of the motion is unclear, though it cannot be the Court given the legal standard applicable to such motions. Regardless, its statements about Dayla Attar's supposed motivation for her actions are without evidentiary support and instead stretch the bounds of common sense. The Defendant's proffered explanation that her conspiracy to make extortionate threats against the victims was done to avoid a pattern of harassment makes little sense logically, but is also an argument better suited for a jury than for the Court were it supported by facts, of which none exist in the motion.

Dalya Attar's appropriately raised legal challenges to the indictment suffer from legal infirmities rendering them unpersuasive. Her challenges to the extortion charges in Counts Two and Three are based on a Supreme Court case, *United States v. Sekhar*, 571 U.S. 729 (2013), that by its own text expressly does not stand for the conclusion Dayla Attar asks the Court here to draw. In so doing, Dalya Attar asks the Court to brush aside Fourth Circuit precedent that supports the extortion charges here, as well as other similar cases in other circuits. Further, the Defendant's

arguments against the Travel Act charge in Count Five lack sufficient precedent to support its sweeping assertion.

### a. Extortion Does Not Require a Transferable Property Interest

Dalya Attar devotes the introduction of her motion to the unsupported claim that "this case is about a family seeking relief from a prolonged campaign of harassment by a disgruntled former employee." *See* ECF No. 45 at 3. While this statement might work for an opening statement to a jury, it should not move the Court at this stage in the proceeding. Dalya Attar provides insufficient documentary support for her expansive claims of "ongoing and well-documented stalking, harassment, threats, and demands," save a vague text message sent years before the Defendants' crimes. Dalya Attar produces no evidence of police reports, cease and desist letters, or other indicia of someone being harassed or threatened. Even if her claim of harassment were true, it is unclear how it would justify the federal crime of illegally recording a person having an affair to extort them. Instead, this portion of the motion serves little purpose other than to attack one of the victims.

The argument further fails because it improperly attempts to litigate the facts of the case in the context of a motion to dismiss an indictment. Dalya Attar spends much of her motion discussing an alleged harassment campaign by Victim 1, introducing unsubstantiated facts for the apparent purpose of discrediting the evidence in support of Victim 1's account. *See id.* at 4 (referencing Victim 1's "campaign of harassment," "relentless[] texting," and showing up invited to unspecified restaurants "for the sole purpose of haranguing Senator Attar"). However, it is well established that "[a] district court is limited to considering the factual allegations in the indictment and must accept them as true in ruling on a motion to dismiss." *United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023). That is so because the court "lack[s] authority to review the sufficiency of the evidence supporting the indictment." *Id.* (quoting *United States v. Wills*, 346

F.3d 476, 488 (4th Cir. 2003)). Dalya Attar's attempts to insert her own factual contentions before the Court at this time are improper and those purported facts should be disregarded. *See id.*

Dalya Attar next argues that Counts Two and Three, Extortion via Interstate Communications and Count Five, the Travel Act, are "facially defective" because the "'object' of the [Defendants'] extortion is non-economic and non-transferrable." *See* ECF No. 45 at 7. This argument ignores clear precedent in service of a stringent and illogical interpretation of the statutes at issue. Beginning with Dalya Attar's argument that the Court should dismiss Counts Two and Three charging Extortion via Interstate Commerce under 18 U.S.C. § 875(d), the Defendant relies almost exclusively on *Sekhar v. United States*, 571 U.S. 729 (2013). *See* ECF No. 45 at 8–10. *Sekhar* involved the attempted compulsion of the general counsel of the New York State comptroller to recommend that his employer approve an investment. The Supreme Court addressed the definition of extortion under the Hobbs Act, 18 U.S.C. § 1951(a). *See* 571 U.S. at 730 ("We consider whether attempting to compel a person to recommend that his employer approve an investment constitutes 'the obtaining of property from another' under 18 U.S.C. § 1951(b)(2)."). The Court stated that under the Hobbs Act, "extortion" is defined as "*the obtaining of property from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Sekhar*, 571 U.S. at 734; *see* 18 U.S.C. § 1951(b)(2). The Court reasoned that to obtain the property from another under the Hobbs Act, the object of the purported extortion must be "transferable—that is, capable of passing from one person to another." *Sekhar*, 571 U.S. at 734.

Dalya Attar seeks to extend that same argument to 18 U.S.C. § 875(d). She contends that "[t]he defendant in *Sekhar* was charged with extortion under both the Hobbs Act, 18 U.S.C. § 1951(a), *and* pursuant to 18 U.S.C. § 875(d)—the statute at issue here." *See* ECF No. 45 at 7

(emphasis added). While true that the Defendant was charged under both statutes, the Supreme Court in *Sekhar* only considered whether the conduct in that case met the definition under the Hobbs Act. The Court says so:

> Petitioner was also convicted of several counts of interstate transmission of extortionate threats, in violation of 18 U.S.C. § 875(d). . . . In this case, both parties concede that the definition of "extortion" under the Hobbs Act also applies to the § 875(d) counts. **We express no opinion on the validity of that concession**.

*Sehkar v. U.S.*, 570 U.S. at 732 n.1 (emphasis added). As such, Dalya Attar asks this Court to do what the Supreme Court declined to do—create precedent extending the definition of Hobbs Act extortion to 18 U.S.C. § 875(d). However, such an application would run afoul of the statutory text and the rules of statutory interpretation.

When courts interpret a statute, they must "first and foremost strive to implement congressional intent by examining the plain language of the statute." *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) (quoting *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)). "If the statutory language is unambiguous and the statutory scheme is coherent and consistent, judicial inquiry ends." *United States v. Selby*, 333 F. Supp. 2d 367, 370 (D. Md. 2004) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (cleaned up)). When the "statutory language is plain and admits of not more than one meaning, the duty of interpretation does not arise." *Selby*, 333 F. Supp. 2d 370 (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). If a court finds statutory language "to be unclear and ambiguous, then the court is permitted to inquire into the statute's legislative history in order to effect the intent of the legislature." *Selby*, 333 F. Supp. 2d 370.

Under the Hobbs Act, "[a]s used in this section . . . (2) The term 'extortion means *the obtaining of property* from another, with his consent, induced by wrongful use of actual or

threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2)

(emphasis added). Because the defendant needed to *obtain property* in order to violate the statutory

text of the Hobbs Act, the *Sekhar* Court's opinion therefore revolved around the definition of that

term. *See Sekhar*, 570 U.S. 732–38.

In contrast, Section 875(d) does not even use the term "property":

> Whoever, with intent to extort from any person, firm, association, or corporation, **any money or other thing of value**, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

(emphasis added). Section 875(d) explicitly does not limit the object of the extortion to an attempt

to "obtain property" and instead includes a broader definition of "any money or other thing of

value." *See id*. A plain language reading of § 875(d), then, necessarily includes more than just

property.

Dalya Attar admits as much. In a footnote, she acknowledges that the "Fourth Circuit has

expanded the definition of a 'thing of value' to include intangible items on one occasion," *See* ECF

No. 45 at 10 n.6. (citing *United States v. Kulla*, 434 F. App'x 268, 269 (4th Cir. 2011)). In *Kulla*,

the Fourth Circuit found that the time and attention of a romantic interest constituted a "thing of

value" in a blackmail case. 434 F. App'x at 269.  In reaching this conclusion, the court stated:

> The words "thing of value" "are found in so many criminal statutes throughout the United States that they have in a sense become words of art. The word 'thing' notwithstanding, the phrase is generally construed to cover intangibles as well as tangibles." *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979). Within the context of various criminal statutes, federal appellate courts have found diverse intangible items to be "things of value." *See United States v. Townsend*, 630 F.3d 1003, 1011 (11th Cir.) (freedom from jail and greater freedom while on pretrial release), *cert. denied* —— U.S. —— ——, 131 S.Ct. 2472, 179 L.Ed.2d 1233 (2011); *United States v.*

<div align="center">18</div>

*Moore*, 525 F.3d 1033, 1047–48 (11th Cir. 2008) (sexual intercourse); *United States v. Marmolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996) (conjugal visits); *Girard*, 601 F.2d at 71 (amusement, sexual intercourse or the promise of sexual intercourse, a promise to reinstate an employee, an agreement not to run in a primary election, or the testimony of a witness).

*Id.* In the same footnote, Dalya Attar asks this Court to disregard *Kulla* because the Fourth Circuit opinion is unpublished, that "the court relied on out-of-circuit authority," and that the "analysis addressed the sentencing guidelines for blackmail [18 U.S.C. § 873], which are not at issue in the instant case." *See* ECF No. 45 at 8 n.6. As an initial matter, the fact that the Fourth Circuit used other circuits to buttress its opinion does not mean that the Court here should disregard its opinion—it instead shows that other circuits have found similarly, thus bolstering the strength of the opinion. Second, in *Kulla*, the Fourth Circuit looked to the definition of blackmail under 18 U.S.C. § 873 to determine whether that statute would serve as an appropriate offense per United States Sentencing Guidelines § 2H1.1(a)(1) from which the sentencing judge could calculate the guidelines for the defendant's deprivation of rights under color of law under 18 U.S.C. § 242. As a result, it was necessary for the Fourth Circuit to define the statutory terms, not simply "address[] the sentencing guidelines." *Compare Kulla* 434 F.App'x at 269, *with* ECF No. 45 at 10 n.6.

While blackmail under Section 873 is not "at issue" in this case, the statute was enacted at the same time as both Sections 875 and 1951 and nonetheless contains language more similar to Section 875 than 1951. *Compare* "any money or other valuable thing" in Section 873, *and* "any money or other thing of value" in Section 875, *with* "obtaining the property from another" in Section 1951. For sure, *Kulla* is unpublished, but it is also the most on point Fourth Circuit guidance before this Court interpreting the phrase "thing of value." *Sekhar* is inapposite because it relates only to the definition of "property." *Kulla* addressed the exact same phrase that is included

in § 875(d), a "thing of value," finding that it is a term of art that can apply to tangible things, like property, and intangible things. *See* 434 F. App'x at 269.

Not only is *Kulla* the closest on point authority and consistent with *Sekhar*, it also makes sense. That is likely why the Eighth Circuit has reached the same conclusion. In *United States v. Hobgood*, a post-*Sekhar* decision, the Eighth Circuit considered whether the defendant's conduct violated 18 U.S.C. § 875(d). 868 F.3d 744, 747–48 (8th Cir. 2017). The defendant in *Hobgood* told his victim that unless she apologized to him, he would continue to make representations to her employer that she was an exotic dancer and prostitute. *Id.* at 747. The Eighth Circuit found that "a 'thing of value' includes intangible things—such as a 'sexual relationship,' for example." *Id.* (quoting *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012)). Indeed, the court stated that "the focus of the term [thing of value] is to be placed on the value which the defendant subjectively attaches' to what he seeks." *Id.* Accordingly, the court found that the defendant's requested apology was a thing of value under § 875(d) and affirmed the district court's denial of defendant's motion to dismiss the indictment. *Id.* at 748; *see also United States v. Barraza*, 655 F.3d 375, 383–84 (5th Cir. 2011) (sexual favors); *United States v. Owens*, 585 F.3d 1055, 1058 (7th Cir. 2009) (anticipation of future sexual encounters); *United States v. Mamolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996) (conjugal visits); *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) (listing precedents construing a "thing of value" to include amusement, sexual intercourse or the promise of sexual intercourse, a promise to reinstate an employee, an agreement not to run in a primary election, or the testimony of a witness); *United States v. Zouras*, 497 F.2d 1115, 1121 (7th Cir. 1974) (testimony against a person).

Here, the documentary evidence will show that Dalya Attar was afraid of the effect that Victim 1 could have on her candidacy for office. In fact, Dalya Attar placed so much value on her

desire to not have Victim 1 affect her election that she and her co-conspirators devised an elaborate scheme to record and extort Victim 1 into silence. Defendants coordinated their contacts with Victim 1 and Victim 2, conveying their demand to have Victim 1 stay out of the election or face severe personal and religious consequences through the release of the video recordings. In fact, the Defendants maintained the recordings for over a year before attempting to extort the victims during Dalya Attar's re-election campaign after they perceived that Victim 1 might negatively impact the campaign. This shows that Dalya Attar was so concerned about Victim 1's potential to impact her campaign that she and the co-Defendants took the extraordinary step to unlawfully threaten and intimidate the victims. Accordingly, the Indictment is not facially deficient under a plain language review of the statute and of the caselaw interpreting a "thing of value"—here, the desire to keep Victim 1 from negatively impacting Dalya Attar's election.

### b. The Travel Act is Properly Charged

Dalya Attar similarly fails in her attempt to extend a narrow definition to 18 U.S.C. § 1952(a)(3) and (b)(2), the Travel Act, which incorporates the definition of extortion under Maryland Criminal Law §§ 3-701, 3-705, and 3-706.

Maryland Criminal Law § 3-701(b) states:

> A person may not obtain, attempt to obtain, or conspire to obtain **money, property, labor, services, or anything of value** from another person with the person's consent, if the consent is induced by wrongful use of actual or threatened . . . economic injury

Maryland Criminal Law § 3-705(a) states:

> A person, with the intent to unlawfully extort **money, property, labor, services, or anything of value** from another, may not verbally threaten to: (1) accuse any person of a crime or of anything that, if true, would bring the person into contempt or disrepute; or (2) (i) cause physical injury to a person; (ii) inflict emotional distress on a person; (iii) cause economic damage to a person; or (iv) cause damage to the property of a person.

Maryland Criminal Law § 3-706(b) states:

> A person, with the intent to unlawfully extort **money, property, or anything of value** from another, may not knowingly send or deliver, or make for the purpose of being sent or delivered and part with the possession of, a writing threatening to: (1) accuse any person of a crime or of anything that, if true, would bring the person into contempt or disrepute; or (2)(i) cause physical injury to a person; (ii) inflict emotional distress on a person; (iii) cause economic damage to a person; or (iv)  cause damage to the property of a person.

Much like the discussion regarding 18 U.S.C. § 875(d), the statutory language is "unambiguous and the statutory scheme is coherent and consistent." *See* Selby, 333 F. Supp. 2d at 370 (*quoting Robinson v. Shell Oil Co.*, 519 U.S. at 340). What is clear from the text of these statutes is that the drafters viewed a more expansive definition of the interest at stake than simply "property," as the Hobbs Act calls for. That is why the definition expands to include items such as "money," "labor services," or "anything of value." *See* Md. Crim. L. §§ 3-701, 705, 706. Despite this clear legislative intent, Dalya Attar asks this Court to do what she earlier said the Court should not: rely on an unpublished opinion, in this case *Kimberlain v. Hunton & Williams LLP*, 2016 WL 1270982 (D. Md. 2016). *See* ECF No. 45 at 11–12.

But *Kimberlain* is an odd fit for the current case. It involved the dismissal of claims by a pro se litigant against attorneys from Hunton & Williams, LLP, the United States Chamber of Commerce, Palantir Technologies, and over two dozen other corporate and individual defendants that claimed a cornucopia of claims, including 18 U.S.C. § 1985(a) and a racketeering claim under 18 U.S.C. § 1962(c) citing mail and wire fraud, in violation 18 U.S.C. § 1341 and 1343, obstruction of justice, in violation of 18 U.S.C. § 1503, intimidation of a witness and retaliation of a victim, in violation of 18 U.S.C. § 1512(d) and 1513(b)-(c), money laundering, in violation of 18 U.S.C. § 1957, and finally extortion, in violation of 18 U.S.C. § 1951 and Maryland Criminal Code § 3-706. *See id.* at *2. Less than a page is given to discussion on this last claim. The district court finds

not cognizable the claim that the extortion was committed by "intruding into Plaintiff's legally protected business and First Amendment activities, and person, family, and business relationships" and by making "written communications under real and fictitious names with intent to extort things of value, including Plaintiff's livelihood and reputation, by falsely accusing Plaintiff of crimes in order to cause him contempt and disrepute." *Id.* at 10. The district court rejected the pro se litigant's vague assertion that the defendants "acted to take his 'livelihood and reputation.'" *Id.* at 10. This vague purported property interest is far from that discussed herein and the case is therefore of little value to this analysis.

*State v. Rendelman*, 947 Md. 500 (2008), gives no greater support to Dalya Attar's position. That case involved a threat to pursue a legal action unless a settlement payment was rendered, which the court deemed was not a "wrongful" threat, and cited the judiciary's role as the institution created to redress wrongs. *See id*. There can be no serious claim that Dalya Attar's secret recording of the affair of Victims 1 and 2 was somehow akin to pursuing a legal claim in court. In fact, had she filed for some sort of restraining order or other civil action with a court for the alleged haranguing she claims she faced, there might actually be some support for the factual recitation at the top of her motion.

In a strawman argument, Dalya Attar misstates the property interests at stake in this case. She asserts, "The Government will likely attempt to deflect from the deficiencies in the Indictment by arguing that Senator Attar retained an 'economic interest' in winning the state delegate election." *See* ECF No. 45 at 9. This is untrue. The "thing of value" that Dalya Attar and her co-conspirators sought from their victims is plainly laid out in the indictment, and satisfies all statutory requirements:

> (a) engaging in any act or speech that could negatively impact the election campaign or political aspirations of **DALYA ATTAR**; and

(b) performing any work for any other candidates for office who would challenge **DALYA ATTAR**

Indictment Counts Two and Three. As is further laid out in the Indictment, Victim 1 was a paid political consultant, working on the campaigns of candidates for both federal and state office, both Republican and Democrat. *Id.* ¶ 2. The above items specifically tie into Victim 1's profession, and compliance with these conditions was therefore something of value—not only to Dalya Attar— but to Victim 1 as well. The Defendants' extortionate demands limited job prospects for Victim 1 with real-life financial consequences. Moreover, the broad nature of the threats created a similarly broad potential scope of violative acts: to include being hired by a candidate running against Dalya Attar, but also perhaps a potential future rival or a candidate running in a different election but known to be antagonistic to Dalya Attar. These were the real, tangible consequences of this threat. Furthermore, the ability to work is itself a property interest, and it has economic value. This threat essentially meant that Victim 1 could not pursue Victim 1's livelihood. By all metrics, this case properly charges a crime. Dalya Attar's motion should be denied.

**B.     Joseph Attar's Motion to Suppress Cell Phone Evidence**

Joseph Attar filed a Motion to Suppress any evidence taken from his cell phone arguing that (1) the OSP Warrant lacked sufficient particularity; (2) the good faith exception does not apply; (3) OSP's search of Joseph Attar's cell phone was unreasonable; and (4) the Federal Warrants were not "genuinely independent" of OSP's searches. *See* Def. Joseph Attar's Mot. Suppress Cell Phone Evidence ["Cell Phone Mot."], ECF No. 57. For the reasons that follow, Joseph Attar's arguments fail and the Motion should be denied.

### a. The OSP Warrant was Sufficiently Particularized and, Even if it Were Not, the Good Faith Exception Applies

Joseph Attar appears to raise two primary contentions in support of his argument that the OSP Warrant violates the Fourth Amendment. First, he asserts that the OSP Warrant placed "no limits on what officers could 'search, seize, view, examine, and extract' from within the device," in other words, that it fails the Fourth Amendment's particularity requirements. Cell Phone Mot. at 7 (emphasis omitted). Second, he contends that the OSP Warrant was unsupported by probable cause. He is wrong.

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. As such, all searches must be reasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011). However, "[i]t is well-settled that the Fourth Amendment does not set forth some general particularity requirement." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020) (quoting *United States v. Grubbs*, 547 U.S. 90, 97 (2006) (cleaned up)). As long as there is probable cause to believe that "contraband or evidence of a crime will be found in a particular place, the Fourth Amendment specifies only two matters that must be particularly described in the warrant: the place to be searched and the persons or things to be seized." *Id.* (*first* quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *and then* quoting *Grubbs*, 547 U.S. at 97 (cleaned up)).

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (quoting *Fernandez v. California*, 571 U.S. 292, 298 (2014)). "To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011).

Further, a court reviewing a judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hyper-technical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), *cert. denied*, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

"[T]he test for the necessary particularity is a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved. There is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized." *Cobb*, 970 F.3d at 327 (quoting *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981)). "When a warrant does not otherwise describe the evidence to be searched for and seized, that gap can be filled if the warrant instead specifies the relevant offense." *United States v. Kuhn*, 809 F. Supp. 3d 236, 362 (E.D.N.C. 2025). "When there is 'specific illegal activity' that tends to "generate[] quite distinctive evidence,' such as bank robbery or possession, receipt, or distribution of child pornography, officers can typically 'identify the property sought with reasonable certainty.'" *Id.* (quoting *United States v. Blakeney*, 949 F.3d 851, 862–63 (4th Cir. 2020)). Finally, exclusion of evidence is an "extreme" sanction. *United States v. Leon*, 468 U.S. 897, 926 (1984).

A commonsense reading of the OSP Warrant shows that it was adequately particularized as to the places to be searched and the things to be seized. On page one, Special Agent Daniel Bralove describes the places to be searched as "Joseph Haim Jaime Attar (ATTAR)," with a photograph of Joseph Attar and a description of "a white male, ~5'6" and ~120lbs, to include bags,

purses, briefcases, backpacks, or any other container, whether locked or unlocked, carried or worn by the person." *See* Cell Phone Mot., Exh. 2, at 1. In addition to describing Joseph Attar's residence in Pikesville, Maryland and his 2022 Cadillac SUV, the OSP Warrant calls for the search of "Mobile Devices/Cellular Telephones, including but not limited to a Samsung SM-G991U with IMEI 350336264071519 and last known telephone number (XXX) XXX-1931." *Id.* at 2. As for the things to be seized, the OSP Warrant states that "there is now being concealed certain property . . . [w]hich is (are) pertaining to violations of Maryland law, *inter alia*, of Extortion in violation of §3-701 of the Maryland Criminal Law Article, Illegal Interception of oral communications, in violation of §10-401 of the Maryland Courts and Judicial Proceedings Article, and Conspiracy to commit these offenses . . . in violation of the common law of Maryland." *Id.* at 1–2. The OSP Warrant then references "the aforesaid Application and Affidavit(s) attached hereto and a part thereof," to establish that "there is probable cause to search, seize, view, examine, and extract from the person or property described above and the search will reveal the evidence described." *Id.* at 2. The OSP Warrant was executed by a judicial officer on July 15, 2022. *Id.* at 3. In essence, the search as authorized was limited to evidence of extortion, illegal interception of oral communications, and conspiracy in violation of Maryland law. The practical, reasonable reading of the warrant provides that the device, along with the car, residence, and person of Joseph Attar, were to be searched only for evidence of the alleged offenses.

The law does not require a high level of evidentiary proof at the warrant-application stage. The law does require only that an affidavit demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011) (quoting *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). That standard is amply satisfied here.

But even if the Court were to find that the OSP Warrant was overly broad, the good faith exception applies. In *Richardson v. State*, which Joseph Attar cites, the Supreme Court of Maryland found that a warrant to search a cell phone that relied on "catchall language" was overly broad. 481 Md. 423, 463 (2022). Specifically, it found that a warrant that authorized law enforcement to search and seize "*all information . . . and any other data stored or maintained*" inside a cell phone violated the Fourth Amendment's particularity requirement. *Id.* (emphasis in original). Still, the court held that the good faith exception applied and that the exclusionary rule was not an appropriate remedy for the overbreadth of the warrant. The same is true here.

"When a court determines that a violation of the Fourth Amendment has occurred . . . exclusion of the fruits of the unreasonable search is not automatic." *Richardson*, 481 Md. at 469 (citing *Herring v. United States*, 555 U.S. 135, 137 (2009)). Indeed, "the exclusion of evidence 'has always been our last resort, not our first impulse.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The *Richardson* court explained that the purpose behind the exclusionary rule is to deter police misconduct:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*Id.* (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984). "The exclusionary rule does not apply where the officers reasonably relied on the issuance of the warrant," because "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. at 922. Under *Leon*, "suppression of evidence obtained pursuant to a

warrant should be ordered on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918.

There are four circumstances that would warrant exclusion under *Leon*:

> (1) the issuing judge was misled by information in an affidavit that the officer knew was false or would have known was false but for the officer's reckless regard for the truth;
> (2) the issuing judge wholly abandoned his or her detached and neutral judicial role;
> (3) the warrant was based on an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable; and
> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers could not reasonably believe it to be valid.

*Leon*, 468 U.S. at 923. "When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Id.* at 924. Of note, *Richardson* was decided after the warrant was signed for the search of Joseph Attar, and the good faith exception to the exclusionary rule permits admission of evidence obtained in objectively reasonable reliance on binding appellate precedent that was later overruled. *See United States v. Wilks*, 647 F.3d 520, 522–24 (citing *Davis v. United States*, 564 U.S. 229 (2011)).

Joseph Attar argues that exclusion is warranted under the third and fourth circumstances. First, he contends that the warrant was so lacking in indicia of probable cause that it "provided nothing more than Special Agent Bralove's "bare bones and conclusory statements" as to why a search was necessary. Cell Phone Mot. at 11. This is not true.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The probable cause standard does not require officers "to possess an airtight case

before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993). The probable cause standard is "not a high bar," *United States v. Blakeney*, 949 F.3d 851, 859–61 (4th Cir. 2020).

Special Agent Bralove laid out in his Affidavit sufficient probable cause to support the OSP Warrant. Without detailing every fact in support of the warrant, Special Agent Bralove described OSP's extensive investigation leading up to that point:

- Victim 1 interacted with Dalya Attar, Joseph Attar, and Kalman Finkelstein during Dalya Attar's 2018 campaign
- Dalya Attar's campaign ended Victim 1's employment after Victim 1 "raised concerns regarding potential improprieties relating to Maryland's election laws"
- In January 2020, Victim 1 coordinated plans with Finkelstein's wife to stay in an apartment leased by one of Finkelstein's relatives
- Victim 2 visited Victim 1 while Victim 1 was staying in the apartment
- Cell phone records tied Dalya Attar, Joseph Attar, and Kalman Finkelstein to one another through frequent voice and text communications during dates and times relevant to the offenses
- On December 6, 2021, Dalya Attar announced her re-election campaign and Joseph Attar reached out to Victim 2 to arrange a meeting. Records showed that joseph Attar and Finkelstein were either on a call or had just concluded a call when Joseph Attar made arrangements to meet Victim 2
- On December 7, 2021, Joseph Attar met Victim 2 at Greenspring Shopping Center. Surveillance footage shows the meeting
- Joseph Attar played Victim 2 a video clip, which Victim 2 recognized as being taken inside the bedroom of the apartment. The clip seemed to come from a camera that was angled down from the ceiling directed at the bed of the apartment
- Victim 2 recognized Victim 1's voice in the clip, and Joseph Attar claimed he had longer copies of the recordings
- Joseph Attar told Victim 2 to instruct Victim 1 not to hurt Dalya Attar's election or he would release the recordings to members of the Orthodox Jewish community in Baltimore
- Joseph Attar sent a message to Victim 1 minutes after the meeting to suggest that Victim 1 speak with Victim 2
- Joseph Attar and Finkelstein spoke on the phone shortly after the meeting
- Finkelstein had occupied the apartment in the days before the recording took place
- On December 12, 2021, Joseph Attar texted Victim 2 to ask if the request would be satisfied.

*See* Cell Phone Mot., Exh. 1. The OSP Warrant and accompanying Affidavit established sufficient probable cause to believe that evidence of the offenses would be on Joseph Attar's phone. Further, Special Agent Bralove, as the affiant, provided his knowledge, training, and experience as well. He explained that mobile devices are commonly used in relation to criminal offenses like those alleged here and specified that the recordings at the center of the extortion scheme may have been maintained on the device. *See id.* Additionally, the facts in support of the Affidavit describe in detail how devices in particular were used here—Defendants called, messaged, and sent voice notes to each other during the critical timeframes, including within minutes of threatening Victim 2. Moreover, Joseph Attar specifically showed Victim 2 the video recording *using his phone*. The OSP Warrant lays out specific facts that support Defendants' extortion scheme in detail. *See Leon*, 468 U.S. at 926 (finding that an officer's application for a warrant "was supported by much more than a 'bare bones' affidavit" where the affidavit "related the results of an extensive investigation").

Second, Joseph Attar argues that exclusion is warranted under the fourth circumstance described in *Leon*, *i.e.*, that the warrant was so facially deficient that the executing officers could not reasonably presume it to be valid. Again, he is incorrect. The information provided in the Affidavit gave officers sufficient detail regarding the Defendants' conspiracy to extort Victim 1 and Victim 2 to support a probable cause determination. Even if the Court finds that the OSP Warrant was overly broad, the officers could have interpreted it as only permitting a search of the phone for evidence connected to the alleged offenses. That is precisely what the *Richardson* court found: "Although we read the affidavit as seeking authorization to search for everything on the phone, an officer reading the affidavit reasonably could have interpreted it as limiting the search for evidence of the crime under investigation." *See Richardson*, 481 Md. at 471. The same

reasoning applies here. The OSP Warrant, which incorporated Special Agent Bralove's Affidavit and was executed by a competent judicial officer, was not so facially deficient as to render the officers' actions unreasonable in executing the search. The Motion should be denied.[3]

Joseph Attar cites *United States v. Winn*, a Southern District of Illinois case from 2015, as support for his requested relief. That case involved an investigation into a misdemeanor charge for public indecency where the suspect was accused of taking photos of young girls at a community pool while rubbing his genitals. *See Winn*, 79 F. Supp. 3d 904, 909. A search of the entirety of the suspects cellphone yielded child pornography, which the district court found was facially overbroad because it exceeded the probable cause that supported it. *See id.* at 919. The court explained that the only categories of data for which the police had probable cause were photos and videos and that the warrant did not have a temporal limit given that the officers only had probable cause for the photos and videos taken on that particular day at that community pool. *See id.* at 921. Unlike in that case, the items searched and seized in this case are directly linked to the offense conduct described in the affidavits, and the conduct described in the affidavit occurred over a lengthy period of time. *See Kuhn*, 908 F. Supp. 3d at 684. This is far afield from *Winn*, where an apparent one-off misdemeanor led to the complete search of the suspect's cellphone contents. Rather here, the warrant was tailored to a specific crime and allowed the executing officers to know precisely what they were authorized to search for. *See id.* at 684 (citing *United States v. Cobb*, 970 F.3d 319, 328–29 (4th Cir. 2020); and *United States v. Blakeney*, 949 F.3d 851, 862–63 (4th Cir. 2020).

---

[3] As Joseph Attar notes, *Richardson* came out about a month after the state warrants were executed. ECF No. 57 at 14 n.8. OSP relied on the law as it existed at the time, which demonstrates that they acted in good faith pursuant to what they understood to be a valid warrant. *See United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019) (holding that the fruits of "a search conducted in reasonable reliance on binding precedent [are] not subject to the exclusionary rule" because the rule is meant "to deter *future* Fourth Amendment violations"); *see also Richardson*, 481 Md. at 479 ("[A] reviewing court should only exclude evidence 'if the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'").

### b. OSP's Search of Joseph Attar's Digital Device was Reasonable

Given the massive amount of information contained on Joseph Attar's digital device, and the significant resource and technological constraints on OSP, the search of Joseph Attar's digital device was reasonable. Joseph Attar rests his argument on a district court case involving federal investigators decided a year after the warrant at issue to critique a relatively small Maryland state agency that nonetheless acted as expeditiously as possible to identify evidence of the Defendant's crime. The evidence demonstrates that OSP's search was entirely reasonable given the circumstances, and certainly nothing like the fact pattern in the precedent cited in support of the Defendant's motion.

"The execution of a warrant for electronic media poses unique challenges for law enforcement and implicates significant Fourth Amendment interests." *United States v. Maresca*, 2026 WL 948289, at *27 (D.D.C. April 6, 2026). The volume and nature of information stored on computers and other electronic devices makes it "often impractical . . . to review all of the information during execution of the warrant at the search location." *Id.* (citing Advisory Committee's note to 2009 amendment to Fed. R. Crim. P. 41(e)). In addition to the immense storage capacity of electronic devices, law enforcement may need to use sophisticated forensic techniques to overcome passwords, encryption, or other "booby traps" to obtain access to materials responsive to the warrant. *Id.* Any search for or manipulation of digital data, moreover, must be done with care, "lest this data be altered or destroyed," or the authenticity or integrity of the evidence called into question. *Id.* (citing *U.S. v. Ganias*, 824 F.3d 199, 212 (2d Cir. 2016)). Rule 41(e)(2)(B) authorizes a two-step process where electronic data may be seized and reviewed. *Id.*; *see United States v. Cawthorn*, 682 F. Supp. 3d 449, 458 (D. Md. 2023). Federal Rule of Procedure

41(e)(2)(B) allows law enforcement to first "seize or copy [on-site] the entire storage medium" and, then, "review it later [off-site] to determine what electronically stored information falls within the scope of the warrant." *Maresca*, 2026 WL 948289, at *28 (quoting Advisory Committee's note to 2009 amendment to Fed. R. Crim. P. 41(e)).

In an attempt to suppress the damning evidence found in his digital device, Joseph Attar cites *United States v. Cawthorn*, a Maryland District Court case decided on July 13, 2023, a year after the search at issue here. 682 F. Supp. 3d at 449. But for a multitude of reasons, the facts of *Cawthorn* are nothing like this case. At the outset, *Cawthorn* involved the search of an Instagram account by federal, not state, investigators. *Id.* Moreover, in *Cawthorn*, investigators obtained search warrant data shortly after its receipt and appears not to have conducted any further review of that material for over two years.[4] Nonetheless, the District Court in *Cawthorn* did not impose "a bright-line time limit within which the Government should have completed its review." *See id.* at 459. Instead, what appears to have doomed the Government in *Cawthorn* was that the Government did not "justify its delay." *See id.* at 458.

Numerous courts pre-*Cawthorn* found lengthy delays in reviewing data reasonable where there is some justification for the delay. *See, e.g.*, *United States v. Hansen*, Crim. No. 18-00346-DCN, 2019 WL 5846879, at *11 (D. Idaho Nov. 7, 2019) (concluding that a search was reasonable where data became reviewable on January 24, 2017 and reviews were conducted during February–September 2017, January 2018, June 2018, July 2018, October 2018, and January 2019 given the "vast quantity of ESI . . . coupled with the limited resources available to the Government"); *United States v. Estime*, Crim. No. 19-0711 (NSR), 2020 WL 6075554, at *15 (S.D.N.Y. Oct. 14, 2020)

---

[4] Indeed, the District Court had previously indicated before those searches that, "Continued access to search through the data beyond what the Government had already identified as responsive in its report would be unreasonable." *Cawthorn*, 682 F. Supp. 3d at 459 n.7.

(finding a ten-month delay to be reasonable where "the Government explain[ed] that its delay in reviewing the ESI contained in Defendant's cellphone is the result of difficulties created by the encryption"); *United States v. Nejad*, 436 F. Supp. 3d 707, 735 (S.D.N.Y. 2020) (finding a review reasonable where it concluded "roughly three years after issuance of the first search warrant in April 2014 and only one year after issuance of the last warrant in 2016," where "the search warrant returns comprised over one million documents in at least three different languages," and the prosecutor "toggled between review platforms throughout the duration of the review in an attempt to more efficiently process this large volume of documents").

This has not changed post-*Cawthorn*, where courts still routinely have found lengthy delays in reviewing electronic data reasonable, provided there is justification for the delay. *See, e.g.*, *United States v. Banwari*, 2025 WL 35881, at *6 (W.D.N.C. 2025) (finding a six year delay "lengthy, but [] not unreasonable" where the Government was unable to fully access the iPhone's data until at least three years after it was seized and where workload and staff turnover caused delay); *United States v. Picca*, 2025 WL 3766106, at *12 (M.D.Pa. 2025) (finding a four and a half year delay "extremely lengthy" but "not unreasonable" where "the Government undertook more-or-less continuous efforts to break the encryption on [defendant's] phone"); *United States v. Olivo*, 2023 WL 8432864, at *2 (S.D.N.Y. 2023) (finding seven month delay for manual search of iPhone not unreasonable "because of technical difficulties arising from damage to the phone and the fact that the manual review was challenging given the volume of material (some in Spanish) on the device").

The search in this case was reasonable given the agency conducting the search, the available resources, and the size of the device. The Government can provide testimony from OSP on these matters should the Court so desire at the hearing on this matter. The Maryland Office of

the State Prosecutor, at the outset, is not like the United States Attorney's Office, or the myriad other federal investigative agencies with which the office regularly works. OSP investigators are not considered "law enforcement officers" under Maryland law and thus do not have the authority to conduct search warrants on their own. *See* Md. Code, Pub. Safety § 1-101 (2025); Md. Code, Crim. Proc. § 1-203 (2025).

OSP's budget was only $1.8 million for Fiscal Year 2022, $2.2 million for 2023, and $2.75 million for 2024. *See* Exhibit 1, Report of the Maryland State Prosecutor, 2024, at 23. The vast majority of that budget pays to fund the salaries and benefits of its employees, not technology. At the time of the July 2022 search warrants, OSP employed only three lawyers in addition to the State Prosecutor. The Assistant State Prosecutor who worked on this case also worked on the office's extensive elections law matters. All lawyers at OSP also work on their own appeals. In late October 2022, the office added a contractual lawyer who later took a full-time role when the lawyer assigned to this case left the office. The office added a fourth lawyer in April 2023. As of July 2022, there were six full-time investigators in the office, one part-time contractual investigator, and a supervisor. Two investigators worked on this matter but also worked numerous other concurrent investigations.

According to the OSP's 2022 report, there were 439 complaints to the office and 63 investigations, not including election law cases. The office had 197 election law referrals, and 68 enforcement actions taken. *See* Exhibit 2, Report of the Maryland State Prosecutor, 2022, at 10. According to OSP's 2023 report, there were 710 complaints received in the office, 109 investigations open, 8 post-conviction petitions, 1,028 election law referrals, and 631 enforcement actions taken. [5] *See* Exhibit 3, Report of the Maryland State Prosecutor, 2023, at 12.

---

[5] Around this time, OSP employees also played a significant role in two federal prosecutions in this district: *United States v. Roy McGrath*, DLB-21-399 and *United States v. Adam Lane Chaudry*, RDB-22-341.

Unlike other investigatory agencies that have their own forensic labs, OSP relies upon other law enforcement agencies, in this case Maryland State Police, to conduct its extractions. OSP does not have a dedicated unit of experts to investigate electronic evidence through Cellebrite or other similar programs, which the Court should recognize in considering the reasonableness of their search. *See Cawthorn*, 682 F. Supp. 3d at 456 (citing *United States v. Chavez*, 423 F. Supp. 3d 194, 208 (W.D.N.C. 2019) (stating that "applying the Fourth Amendment to social media accounts is a relatively unexplored area of law with nuances that have yet to be discovered" and that "[c]ourts should not punish law enforcement officers who are on the frontiers of new technology simply because they are at the beginning of a learning curve and have not yet been apprised of the preferences of courts on novel questions" (citation and quotations omitted)).

Further, when the July 2022 search warrants were executed, OSP was initially unable to make use of the extracted material because the office's laptops were not capable of processing the information rapidly enough. The office was required to purchase a desktop computer powerful enough to do so, which did not occur until October 2022. This meant that the office had only one desktop computer to review electronic device extractions. OSP therefore could only accommodate one person reviewing a single device at a time. This case had multiple devices that required review, and the office concurrently handled other cases requiring device review. Because the computer was a desktop, the review could not be conducted at home. Even still, because of the sheer size of the material on Joseph Attar's digital device, OSP had to wait over a full day for the program to even boot up before a review could take place. Even after it loaded, the program would regularly crash and be required to start over again.

As to Joseph Attar's phone, he used multiple communication platforms, to include iMessages and SMS messages, as well as messaging applications like WhatsApp. His device

contained approximately 700,000 images, 11,000 videos, 29,000 instant messages, 1,100 emails, 3,400 chats, and 32,000 texts. Investigators could see that Joseph Attar regularly attempted to delete items from his phone, further complicating the search. These items were not contained in one "deleted items" folder. Instead, OSP had to search for individual text and voice notes, or photos, and then go through the process of tracing those items back to their original locations within a WhatsApp or text thread, which itself might have been deleted. This made the review even more time-consuming.

Joseph Attar's complaints that OSP's review of Joseph Attar's digital device was "similarly unreasonable" as to the search conducted in *Cawthorn* is erroneous. Joseph Attar argues that OSP "sat on a vast trove" of his personal data for three years, while simultaneously complaining that OSP's strategy consisted of "prolonged rifling" through those files. Either OSP sat on the data, as did the investigators in *Cawthorn*, or OSP's review was too extensive.[6] Both cannot be true, and in fact neither are. The unsettled nature of the argument shows its weakness.

By contrast, the record shows just the opposite of *Cawthorn* in this case. OSP, constrained by limited budget and resources, significant technological hurdles, a high case load, and efforts by Joseph Attar to delete information, spent two years attempting to complete a review of a digital device containing an enormous amount of data. Considering these factors, OSP acted reasonably in its search.

### c. The Federal Warrant is Not Tainted by the OSP Warrants

Finally, Joseph Attar argues that the Federal Warrant is not "genuinely independent" of the OSP Warrants and therefore any evidence obtained from the Federal Warrant should be excluded

---

[6] In reference to the Defendant's charts, Cellebrite reports indicate only that information was pulled for a particular purpose, such as an interview or other meeting, and a gap in reports is not evidence that investigators ceased review of the material in the interim.

as fruit of the poisonous tree. *See* ECF No. 57 at 18. This argument, too, must fail. First, the OSP Warrants were lawful, ending the analysis. Even if they were not, good faith applies and the OSP Warrants would survive on that basis. Further, a review of the Federal Warrant compared to the OSP Warrants establishes that the affidavit in support of the Federal Warrant does not expand the facts beyond those contained in the OSP warrant. Even if the Court were to find that evidence obtained from the OSP Warrants should be excluded, the Federal Warrant was drafted independently based only on information that was available to OSP when the OSP Warrant was initially obtained. Accordingly, even if the OSP Warrant was unlawful and warranted suppression of the evidence, which it was not, the Federal Warrant did not rely upon any evidence obtained from the OSP Warrant returns.

Joseph Attar goes to great lengths to argue that the federal search warrants were done to "paper over the state's constitutional violations," but no such constitutional violations exist. *See* ECF No. 57 at 18. The Defendant's attempts to paint the Government's diligence in reviewing the phones for electronic evidence themselves is not a concession, and it should cast no aspersions on the excellent work of the OSP and its employees in bringing this serious crime to light. In search of his requested relief, Joseph Attar cites *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007), in support of two propositions. First, that suppression of evidence obtained as a result of an unlawful search is a remedy for Fourth Amendment violations, and second, that courts will suppress evidence that is the indirect product of illegal police activity as fruit of the poisonous tree. *See* ECF No. 57 at 18.

Joseph Attar's arguments fail for several reasons. First, and most significantly, the searches pursuant to the state warrants were lawful for all the reasons described above. Second, *Oscar-Torres* is inapposite and its application here would be excessive and inappropriate. There, the

Fourth Circuit Court of Appeals considered whether fingerprint evidence taken after *an entirely warrantless immigration arrest* necessitated suppression as fruit of the illegal arrest. *Id.* at 226. The court noted that the Bureau of Immigration and Customs Enforcement had recently conducted a two-week initiative "targeting street gang members illegally present in the United States." *Id.* As part of that initiative, ICE stationed itself at the entrance to an apartment complex and stopped all individuals entering and leaving for questioning. Officers then encountered Oscar-Torres, who admitted to being an illegal alien, and then they lifted his shirt to find a tattoo that they believed might be affiliated with a gang. They then arrested him without an arrest warrant, transported him to ICE headquarters, fingerprinted him, interrogated him without advising him of his *Miranda* rights, and used the statements he made prior to any advisement of rights along with his fingerprints to discover his criminal record and a prior deportation. The government then relied upon this information to charge Oscar-Torres with violating Title 8, United States Code, Section 1326(a).

Nothing like that exists here—the searches were done pursuant to lawful warrants, and the extreme sanction of suppression would be inappropriate. Joseph Attar is correct in his selection from *Oscar-Torres*. It is true that "suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations." *Oscar-Torres*, 507 F.3d at 227. It is also correct that "[c]ourts will also suppress evidence that is the indirect product of the illegal activity as 'fruit of the poisonous tree'" *Id.* However, his motion omits the next sentences in *Oscar-Torres*:

> Of course, not all evidence that 'would not have come to light but for the illegal actions of the police' is suppressible as fruit of the poisonous tree. Rather, the critical inquiry is 'whether, *granting establishment of the primary illegality*, the evidence to which instant objection is made has been come at by exploitation of that illegality

or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* (internal citations omitted) (emphasis added). Here, Joseph Attar has failed to establish primary illegality, and this entire analysis is inapplicable. The magistrate judge found that the warrant was supported by probable cause, and it indeed was. Joseph Attar has not established that the magistrate judge was misled into believing that probable cause existed. Again, even if the warrant were to be found to be overly broad or unparticularized, the exclusionary rule would not apply here:

> The exclusionary rule "is neither 'a personal constitutional right' nor is it 'designed to redress the injury occasioned by an unconstitutional search.'" Rather, the exclusionary rule "is a prudential doctrine created . . . to compel respect for" constitutional rights. "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Where suppression would not produce deterrent benefits, the exclusionary rule does not apply.
>
> For that reason, evidence obtained pursuant to a search warrant issued by a neutral magistrate need not be excluded if the officer's reliance on the warrant was "objectively reasonable." **Generally, the fact that a neutral magistrate has issued a warrant "suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." Therefore, searches carried out pursuant to a warrant "rarely require any deep inquiry into reasonableness."**

*United States v. Chatrie*, 590 F. Supp. 3d 901, 937 (E.D. Va. 2022), *aff'd*, 107 F.4th 319 (4th Cir. 2024), *on reh'g en banc*, 136 F.4th 100 (4th Cir. 2025), and *aff'd*, 136 F.4th 100 (4th Cir. 2025) (internal citations omitted) (emphasis added).

Such is the case here. Exclusion would not be warranted because there was no deliberate, reckless, or grossly negligent conduct. Because there was no misconduct, deterrence is not a factor, and the "extreme" sanction of exclusion would serve no purpose. *See Leon*, 468 U.S. at 926.

And as the Government has established, reliance on the warrant was reasonable and even if there were some finding of a Fourth Amendment violation, the good faith exception absolutely

applies. *See id.* (finding that good faith exception shielded the evidence from suppression because even though the subject warrant lacked particularized probable cause, it was not so lacking as to render official belief in the existence of probable cause entirely unreasonable).

Joseph Attar argues that the only way that the Government can avoid suppression of evidence obtained from the Federal warrants is if the independent source doctrine applies. *See* ECF No. 57 at 19. Because exclusion is unwarranted, the Court need not reach the independent source doctrine. Regardless, Joseph Attar cites *United States v. Hill*, 776 F.3d 243 (4th Cir. 2015), in support of his claim that the Government must rely upon the independent source doctrine to avoid suppression. He is wrong.

In *Hill*, the Fourth Circuit considered whether to suppress evidence obtained after law enforcement entered the defendants' home to execute an arrest warrant, then conducted a walk-through of the home to look for contraband and had a drug sniffing dog sniff around all without a residential search warrant. *Id.* at 245. It was only after the dog alerted that law enforcement obtained a warrant to search the home. The court found that the walk through and dog sniff done prior to obtaining a residential search warrant violated the Fourth Amendment and that good faith did not apply in such a situation. *Id.* It was only after reaching that conclusion that the court considered whether the independent source doctrine might somehow preclude exclusion of the evidence obtained as a result of the search. Just like *Oscar-Torres*, *Hill* involved an initial, illegally warrantless search.

The facts here do not require an application of the independent source doctrine to avoid suppression. In order to even reach Joseph Attar's argument on the doctrine, the following would need to be true: (1) OSP engaged in "exploratory rummaging" through Joseph Attar's phone; (2) the warrant was not particularized and effectively unbounded; (3) the warrant was unsupported by

probable cause even though it outlined the precise details of how Victim 1 stayed in an apartment leased by Finkelstein's family, that Finkelstein acknowledged having "proof" of Victim 1 and Victim 2's affair, that Joseph Attar met with Victim 2 in person and used his phone to show Victim 2 video that had been recorded of Victim 1 and Victim 2 in the apartment on, that Defendants frequently communicated with one another, that Joseph Attar claimed to have additional recordings, that Joseph Attar continued to threaten Victim 2 by text message, and many more details; (4) the warrant was so lacking in indicia of probable cause as to render official belief in its existence "entirely unreasonable"; and finally (5) that the warrant was so facially deficient that an executing officer could not reasonably presume it to have been valid. Joseph Attar thus asks this Court to make findings not grounded in the reality of this case after relying on authority that is inapposite or readily distinguishable. The state warrants were not illegal. Even if they were, exclusion would not be appropriate sanction. Therefore, we do not even reach the independent source doctrine.

Even if the OSP warrants were somehow unlawful, the inevitable discovery doctrine applies. Under the inevitable discovery doctrine, "the government [can] use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" *Kuhn*, 809 F. Supp. 3d at 368. In order for the doctrine to apply, the government "must prove by a preponderance of the evidence: first, that police legally could have uncovered the evidence; and second, that police would have done so." *Id.* (quoting *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019)). "[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence." *United States v. Whitehorn*, 813 F.2d 646, 650 n.4 (4th Cir. 1987). "[I]f the government can prove that the evidence

would have been obtained inevitably and therefore would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "To rely on the inevitable discovery doctrine, the Government must first prove that police could have used 'lawful means' to discover the illegally obtained evidence." *Alston*, 941 F.3d at 138 (citing *Nix*, 467 U.S. at 444). 'Lawful means' include a search pursuant to a valid warrant. *Kuhn*, 809 F. Supp. 3d at 369. Here, even if everything Joseph Attar claims were true, the Government would have inevitably discovered the same evidence because it obtained its own Federal warrant authorized by a neutral magistrate that was untainted by any fruits of the OSP warrants. None of the probable cause in the Federal warrant relied upon evidence obtained through the OSP warrants. Thus, lawful means exist here as the Federal warrants are valid. The Court need not reach the independent source doctrine or the inevitable discovery doctrine, but in the event that it does, the inevitable discovery doctrine applies.

**C.**      <u>**Joseph Attar's Motion to Suppress Evidence Obtained through Coercion**</u>

Joseph Attar's self-serving declaration claiming he was coerced into providing his passcode by law enforcement in support of his motion seeking the same suppression he fails to obtain through his first motion fails just the same. *See* Def. Joseph Attar's Mot. Suppress Evidence through Coercion ["Coercion Mot."] at 5–9, ECF No. 61. Joseph Attar's statement is not true— his disclosure of his passcode was voluntary, and law enforcement never told him he was required by court order to provide it. Exclusion of the evidence thus is not warranted, and his motion should be denied.

Joseph Attar claims via a one-and-a-half-page declaration dated March 31, 2026 that a law enforcement officer told him that they needed the passcode and when Joseph Attar asked whether

he had to provide the passcode, the law enforcement officer said that he "had to provide the passcode for the phone because of the judge's 'order.'" *See* Coercion Mot., Exh. 17, at 1. This is not true. The Government will present testimony from OSP Special Agent Daniel Bralove at the motions hearing refuting Joseph Attar's false claim that he was told that he was required to give officers his passcode pursuant to a court order.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "[T]he privilege protects a person only against being incriminated by his own compelled testimonial communications." *Doe v. United States*, 487 U.S. 201, 207 (1988) (quoting *Fisher v. United States*, 425 U.S. 391, 409 (1976)). A violation only occurs if "the accused is [1] compelled [2] to make a testimonial [3] that is incriminating." *United States v. Oleyede*, 933 F.3d 302, 309 (4th Cir. 2019) (quoting *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007)). "The 'mere existence of threats, violence, implied promises, improper influence, or other coercive police activity' does not automatically render a confession involuntary under the Fifth Amendment's Due Process Clause." *United States v. Kuhn*, 809 F. Supp. 3d 326, 352 (E.D.N.C. 2025) (quoting *Braxton*, 112 F.3d at 780). Instead, courts look to whether those influences "rendered the defendant's will overborne or his capacity for self-determination critically impaired." *Id.* (quoting *Braxton*, 112 F.3d at 780 (cleaned up)). Courts apply a totality of the circumstances test to determine whether a defendant's will was overborne or his capacity for self-determination was critically impaired. *Id.* Factors to consider include the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *Id.* "The court may consider age, education, intelligence, lack of any advice of rights, length of detention, the repeated and prolonged nature of the questioning, and the use of physical

punishment such as deprivation of food or sleep." *Id.* "[V]ery few incriminating statements, custodial or otherwise, are held to be involuntary." *Id.* (quoting *Braxton*, 112 F.3d at 786).

In the event the Court sets this matter for a hearing, the Government will call OSP Special Agent Bralove. Special Agent Bralove was present for the execution of the search warrant and spoke with Joseph Attar on the day of the search. Special Agent Bralove can be expected to testify as to his typical procedure in such a search warrant, including what he routinely says. He will testify that he would not have made the statement Joseph Attar alleges. Instead, he would have said something regarding, were Joseph Attar to provide the passcode to his phone, it could speed up his getting the phone back. Special Agent Bralove will also be made available for cross examination.

Based on this testimony, the Court will have the necessary evidence to conclude that Joseph Attar provided his passcode voluntarily on the day of the search. The fruit of a voluntary disclosure is admissible into evidence. *See Oleyede*, 933 F.3d at 309 ("[E]ven were we to accept [defendant's] argument that she made a testimonial communication when she unlocked her phone, it would provide no meaningful help to her defense because the fruit of that *voluntary* communication, even though made without a *Miranda* warning, would nonetheless be admissible into evidence."). As such, there is no basis to exclude evidence from Joseph Attar's cell phone.

Beyond this testimony, the totality of the circumstances also demonstrate that Joseph's Attar's disclosure of his passcode was voluntary. Joseph Attar was 35 years old when he spoke to the officers. There was one investigator and one police officer present at the time in a public location, he had not been placed under arrest, and no guns were drawn or restraints used. The agents informed Joseph Attar about the search warrant, and were polite, calm, and courteous. As Special Agent Bralove can testify, the agents never raised their voices or made any threatening

comments. There is no evidence to suggest that Joseph Attar was coerced into providing his phone. In fact, he subsequently sat for a voluntary interview.

Third, even if Joseph Attar were somehow compelled to provide his cell phone passcode, the inevitable discovery doctrine applies. Under the inevitable discovery doctrine, "the government [can] use information obtained from an otherwise unreasonable search [or unlawful confession] if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" *Kuhn*, 809 F. Supp. 3d at 368. In order for the doctrine to apply, the government "must prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *Id.* (quoting *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019)). "[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. *United States v. Whitehorn*, 813 F.2d 646, 650 n.4 (4th Cir. 1987). "[I]f the government can prove that the evidence would have been obtained inevitably and, therefore would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

"To rely on the inevitable discovery doctrine, the Government must first prove that police could have used 'lawful means' to discover the illegally obtained evidence." *Alston*, 941 F.3d at 138 (citing *Nix*, 467 U.S. at 444). 'Lawful means' include a search pursuant to a valid warrant. *Kuhn*, 809 F. Supp. 3d at 369. As explained above, the OSP Warrant and the Federal Warrant were lawful. As such, even if Joseph Attar were unlawfully compelled to provide his passcode, which he was not, law enforcement would have been able to access and search the phone. In *United States*

*v. Kuhn*, the United States District Court for the Eastern District of North Carolina reached the same conclusion:

> [E]ven if the court found that Kuhn's two statements to agents giving them his passcode were inadmissible (which it does not), the agents had valid search warrants for Kuhn's cellphone. Specifically, the agents had the authority to seize Kuhn's cellphone, take the cellphone to the Department of Homeland Security lab as part of the two-step process under Federal Rule of Criminal Procedure 41(e)(2)(B), and use software such as Graykey or Cellebrite to extract relevant evidence from Kuhn's cellphone.

*Id.*

The Government will also be prepared to call a forensic examiner at a hearing on this matter who can provide the Court information regarding the likelihood that the FBI could have accessed this phone without a passcode. The Government will thus be able to prove by a preponderance of the evidence at the motions hearing that law enforcement would have been able to access the device to a strong degree of likelihood without the passcode. The process would have taken longer, but Joseph Attar's phone would nonetheless have been accessible and searchable. Because Joseph Attar's scant declaration, prepared after indictment based in part on evidence found on his phone, is unreliable and insufficient to overcome the expected testimony of Special Agent Bralove and the totality of the circumstances of the search, notwithstanding the law on inevitable discovery, this motion should be denied.

**D.      Kalman Finkelstein's Motion to Suppress Evidence**

Finally, Kalman Finkelstein filed a Motion to Suppress evidence from the OSP Google Warrants, the 2022 OSP Phone Warrant, and the Federal Warrants. *See* Def. Kalman Finkelstein's Mot. Suppress Evidence, Req. H'rg ["Finkelstein Mot."], ECF No. 67. He argues that the evidence should be excluded on spousal privilege, probable cause, overbreadth, particularity, and taint grounds. Further, he requests a *Franks* hearing due to a purported omission in the Federal

Warrants. *Id.* at 25–26. Finkelstein's Motion fails because he misstates and misapplies the law regarding the marital communications privilege and his remaining Fourth Amendment arguments fall for the same reasons as Joseph Attar's Cell Phone Motion. Even if the warrants were unsupported by probable cause, overbroad, and insufficiently particularized, which they were not, the good faith exception applies. Also, Finkelstein has not articulated entitlement to a *Franks* hearing. The Motion should be denied.

### a. The Marital Communications Privilege Does Not Apply

Finkelstein argues that the OSP Google Warrants must be suppressed because they included information protected by the spousal communications privilege to establish probable cause to search his accounts. *See* ECF 67 at 10–12. In advancing this argument, Finkelstein conflates the different standards applicable to the two marital privileges and, in any event, overstates the application of the marital communications privilege here. Even if the marital communications privilege were to apply to some of the facts identified in the OSP Google Warrants, which it does not, the removal of those facts would not defeat probable cause and the warrant stands.

Finkelstein states that "[t]he confidential marital communications privilege 'prevents a spouse from testifying against the defendant regarding confidential communications between the spouses.'" *Id.* at 10 (quoting *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995) (emphasis added)). He further claims that the privilege cannot be unilaterally waived by one spouse, citing Federal Rule of Evidence 1101 and a United States District Court for the District of Vermont for the proposition that the marital communications privilege applies to "proceedings held for the issuance of search warrants." *Id.* at 11 (*first* quoting Fed. R. Evid. 1101; *and then* quoting *United States v. Estes*, 609 F. Supp. 564, 570–71 (D.Vt. 1985)). He then cites a string of unrelated cases

from other jurisdictions to argue that the judge who authorized the search warrant should have disregarded any information in the affidavit that was purportedly protected by the marital communications privilege, before leaping to the groundless claim that without these communications, the warrants lacked probable cause. *See id.*

The only privilege that could theoretically apply here is the marital communications privilege, not the adverse testimony privilege. It is true that "[m]arital communications are presumptively confidential." *United States v. Hamilton*, 778 F. Supp. 2d 651, 654 (E.D.Va. 2011) (first citing *Blau v. United States*, 340 U.S. 332, 333 (1951); and then citing *United States v. Parker*, 834 F.2d 408, 411 (4th Cir. 1987)). However, "that presumption may be overcome by proof of facts showing that they were not intended to be private." *Pereira v. United States*, 347 U.S. 1, 6 (1954) (citing *Blau*, 340 U.S. at 332); *see also* § 505:2 Husband-wife privilege: confidential communication, 4 HANDBOOK OF FED. EVID. § 505:2 (10th ed.).

Here, Finkelstein did not intend for his statements to be held within the confidence protected by the marital communications privilege, and therefore it does not apply. As written in the affidavit, Finkelstein sent the following text messages to his wife:

> *"How's (Victim #2) and (Victim #1's) live life going? I wonder how his wife will take the news. Lol \*love"*. Finkelstein also wrote *"Does (Victim #1) know we all know about her and (Victim #2)? Oh and have proof? I'm (sic) (Victim #2's spouse) would love to see it."* Finkelstein concluded the text conversation with ***"Plmk how she responds when u tell her we all know :)"***

Finkelstein Mot., Exh. 1 § 23 (emphasis added). Finkelstein directly acknowledges his wife was going to tell Victim 1 the information gathered as part of this extortion plot—indeed, he sounds excited about it. The evidence further suggests that Dalya Attar and Finkelstein communicated about using Finkelstein's wife, previously a close friend of Victim 1's, to convey these messages. On April 8, 2022, Dalya sent Co-Conspirator 1 a WhatsApp message stating, "[Finkelstein] is fine

with us showing [Finkelstein's wife] . . . I think it may still help cuz [Victim 1] would see we're showing it." *Id.* ¶¶ 13mm.

Finkelstein's messages to his wife, and the communications of his co-conspirator Dalya Attar, demonstrate that Finkelstein had no intention for his communications to be private. Again, he tells her to "[please let me know] how she responds when u tell her ***we all*** know." (emphasis added). His message suggests that his wife would not only communicate about the existence of the videos, but also the fact that Defendants, including Finkelstein, were aware of the affair and the videos.

And Finkelstein's wife did exactly what he thought she would do—she forwarded Finkelstein's messages, at least the ones that were not deleted, to Victim 1:







Finkelstein had no reasonable expectation that those communications would be held within marital confidence, and the marital communications privilege simply does not apply.

Even if the privilege did apply, Finkelstein waived it. "[C]ourts have *uniformly held* that the marital communications privilege can be waived," for instance, "when the holder of the privilege . . . is in possession of the materials at issue and fails to take adequate precautions to maintain their confidentiality." *Id.* at 655 (quoting *SEC v. Lavin*, 111 F.3d 921, 930 (D.C.Cir. 1997)). This "implied waiver" has been explained as follows:

> When the disclosure [of privileged material] is involuntary, we will find the privilege preserved if the privilege holder has made efforts "reasonably designed" to protect and preserve the privilege. Conversely, we will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter.

*Id.* (quoting *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992)). Finkelstein did not make efforts to protect and preserve the confidentiality of the privileged matter. He specifically encouraged his wife to disclose what they knew to Victim 1. The evidence demonstrates the Defendants agreed to bring Finkelstein's wife in on scheme, because of its supposed effect on her friend, Victim 1. This plan was evidenced by Dalya Attar's April 8, 2022 messages to Co-Conspirator 1 referenced above, to include: "[Finkelstein] is fine with us showing [Finkelstein's wife] . . . I think it may still help cuz [Victim 1] would see we're showing it." *See* Indictment at ¶¶ 13mm. These were not private communications intended to be shielded from public view. Further, the screenshots of the text message chains show that Finkelstein deleted many messages with his wife. Notably, he did not delete these particular messages. His failure to do so, when read in context with his conscious decision to delete most others, shows that he did not make efforts to protect any confidentiality over the communications.

Regardless, the Court does not even need to address the purportedly privileged material cited in the affidavit because the warrant is sufficiently supported by probable cause without it. In fact, Finkelstein himself spells out all of the independent probable cause tying him to the crimes committed in this case:

> That leaves from the OSP Google affidavits: (i) Mr. Finkelstein and Mr. Attar both worked with the Campaign Committee for [Dalya Attar]; (ii) communications between Mr. Finkelstein and Mr. Attar, including on the day Mr. Attar allegedly showed Victim #2 the video on Mr. Attar's device; (iii) a "belief" expressed by a "resident" of the Apartment that Mr. Finkelstein stayed in the Apartment "just prior" to Victim #1's stay at the Apartment "where the recordings were captured during January 2020" as he sometimes did after working overnight shifts; and (iv) communications between Mr. Finkelstein and [Dalya Attar].

*See* ECF No. 67 at 12. Even as laid out in a defense-oriented framing, those facts in the affidavits are more than sufficient for a judge to have found that the warrant was supported by probable cause. Finkelstein's spousal privilege arguments fail.

### b. The Warrant is Not Overbroad, Unparticularized, or Tainted

As was the case with Joseph Attar's Cell Phone Motion, Finkelstein's Motion fails to establish that the OSP Google Warrants and the OSP Phone Warrant were overbroad, unparticularized, or otherwise tainted.

First, Finkelstein argues that the Google Warrants gave "blanket authorizations to search nearly the entirety of Mr. Finkelstein's Google account—all emails; his Google Drive in its entirety; all data stored within Google Photos; and all user activity." *See* ECF No. 67 at 15–16. That is a significant overstatement. Google contains troves of information across dozens of distinct applications. The Google Warrants sought evidence narrowed to this case, such as communications between the Defendants regarding their conspiracy and media files that Defendants used to extort the victims.

Both warrants included an Attachment A-1, the evidence to be seized. As for the Google accounts, the evidence to be seized, for a period beginning on January 1, 2020 through January 27, 2022, was as follows:

> 1) Google account registration information, including name, user-specified contact information, recovery email address, recovery SMS number, account creation timestamp and IP address, and a list of Google services the account holder has enabled or accessed;
> 2) Account change history IP addresses and associated timestamps;
> 3) Google account login and logout IP addresses and associated timestamps;
> 4) Gmail specific subscriber information, login and logout IP addresses and associated timestamps;
> 5) Gmail specific non-content email header information, originating message IP addresses, and account settings;
> 6) The contents of all e-mails and attachments in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination e-mails sent addresses associated with each e-mail, the date and time at which each e- mail was sent, and the size and length of each e-mail;
> 7) Contents of all available deleted emails;
> 8) Google Drive data in its entirety for the account, including photos, videos and stored content, and content that has been deleted or marked for deletion, with all associated metadata and internet protocol logs corresponding with accesses, uploads, downloads, or other user activity; and
> 9) All data stored within Google Photos - All images, graphic files, video files, and other media files stored in the Google Photos service, including the content that has been deleted or marked for deletion, with all associated metadata and internet protocol logs corresponding with accesses, uploads, downloads, or other user activity.

*See* ECF No. 67-3 at 21.

The warrants were not designed to simply "rummage" through Finkelstein's Google data. In fact, the investigators working on the case would not have been able to review all of his Google data. The warrants were written with an intention to find communications and potentially video and media files connected with Defendants' crimes in a case where the Victims were systematically recorded and extorted. It was narrowed to a specific window of time for specific

evidence. In short, it particularly described the place to be searched and the things to be seized. *See Cobb*, 970 F.3d at 327.

The OSP Phone Warrant essentially tracks the Joseph Attar Cell Phone Warrant and is also sufficiently particularized. Special Agent Bralove describes the places to be searched as "Kalman Gavriel Finkelstein," with a photograph of Finkelstein and a description of "a white male, ~6'1" and ~215lbs, to include bags, purses, briefcases, backpacks, or any other container, whether locked or unlocked, carried or worn by the person." *See* OSP Phone Warrant at 7, ECF No. 67-7. In addition to describing Finkelstein's residence in Pikesville, Maryland and his 2021 Chevrolet Tahoe, the warrant calls for the search of "Mobile Devices/Cellular Telephones, including but not limited to a Samsung SM-F926U cellular telephone with IMEI 3502377275098708, and last known phone number of (XXX) XXX-8549." *Id.* at 2. As for the things to be seized, the OSP Warrant states that "there is now being concealed certain property . . . [w]hich is (are) pertaining to violations of Maryland law, *inter alia*, of Extortion in violation of §3-701 of the Maryland Criminal Law Article, Illegal Interception of oral communications, in violation of §10-401 of the Maryland Courts and Judicial Proceedings Article, and Conspiracy to commit these offenses . . . in violation of the common law of Maryland." *Id.* at 5–6. The OSP Warrant then references "the aforesaid Application and Affidavit(s) attached hereto and a part thereof," to establish that "there is probable cause to search, seize, view, examine, and extract from the person or property described above and the search will reveal the evidence described." *Id.* at 6. The OSP Warrant was executed by a judicial officer on July 15, 2022. *Id.* at 3. In essence, the search as authorized was limited to evidence of extortion, illegal interception of oral communications, and conspiracy in violation of Maryland law. The practical, reasonable reading of the warrant provides that the device, along with the car, residence, and person of Kalman Finkelstein, were to be searched only for evidence

of the alleged offenses. *See Cobb*, 970 F.3d at 327 (emphasizing the "practical margin of flexibility permitted by the constitutional requirement for particularity"). The affidavit also explains that phones often contain text messages, hidden data, metadata, and media files of evidentiary value, and references the "Target Offenses" described above. Again, "[w]hen a warrant does not otherwise describe the evidence to be searched for and seized, that gap can be filled if the warrant instead specifies the relevant offense." *Kuhn*, 809 F. Supp. 3d at 362. The cell phone warrant specified the pertinent offenses here.

Even if the Google Warrants and OSP Phone Warrant were overbroad and unparticularized, the good faith exception outlined in response to Joseph Attar's Cell Phone Motion applies here as well. Again, even after a court makes a finding that a Fourth Amendment violation has occurred, "exclusion of the fruits of the unreasonable search is not automatic." *Richardson*, 481 Md. at 469. The "last resort" of exclusion is applicable where courts want to signal a deterrent effect over police misconduct, not where action was taken in good faith. *Id.* Here, the investigators reasonably relied on the issuance of the pertinent warrants, and the "substantial costs of exclusion" would be unwarranted. *See Leon*, 468 U.S. at 922. This is not the type of "unusual case" where "exclusion [would] further the purposes of the exclusionary rule." *Id.* at 918. And as explained above, the warrants were supported by probable cause and were not so facially deficient as to make an executing officer question their validity. *See generally id.* at 923.[7] The Motion should be denied.[8]

---

[7] The Government recognizes that Finkelstein "incorporates the argument made and accompanying case law referenced in [Joseph] Attar's Motion to Suppress as if fully incorporated" into his Motion as to the Federal warrants. Finkelstein Mot. at 22. Likewise, the Government incorporates its responses to Joseph Attar's arguments above.

[8] Finkelstein also argues that the 2024 OSP Google Warrant should also be excluded because *Richardson* held that "warrants requesting everything on a cellphone violates the particularity requirement" and that it would be presumed that all officers should understand that fact for warrants moving forward. Finkelstein Mot. at 16. It is not clear how *Richardson*'s extension of that presumption to law enforcement would apply here, where the warrant was not for all contents of a cell phone, but was instead for specific files on Finkelstein's Google account, in this case files the Government believes OSP needed reproduced by Google from the 2022 warrant.

### c. Finkelstein is Not Entitled to a *Franks* Hearing

Finally, Finkelstein requests a *Franks* hearing, arguing that the 2025 Federal Warrants omit a material fact that would have defeated probable cause. ECF No. 67 at 25. Not so. His request should be denied.

In *Franks v. Delaware*, the Supreme Court set forth a two-step process for defendants seeking to challenge search warrant affidavits. 438 U.S. 154 (1978). First, a defendant must make a **substantial** preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant. *Id.* at 155–56. Second, the allegedly false statement must be necessary to the finding of probable cause. Only if these showings are met will be a hearing be held at the defendant's request. *Id.* This showing "must be more than conclusory" and should include affidavit or other evidence." *Id.* at 171. As for Finkelstein's allegations of omissions in this case, the *Franks* threshold is even higher. As stated by the court in *United States v. Clenney*, "[m]erely identifying factual omissions is insufficient." 631 F.3d 658, 664 (4th Cir. 2011). Finkelstein must show that the omissions were designed to mislead and were material to the finding of probable cause.

Finkelstein argues that FBI failed to state in its 2025 warrants that it had not yet located the videos Defendants recorded of the Victims and that omission was "intentional or, at the very least, done with reckless disregard about whether it would mislead the issuing judge into believing that Mr. Finkelstein's Google account or devices may have this evidence." ECF 67 at 26. Finkelstein's exaggerated contentions strain credulity. Of course, it is true that investigators have yet to have located the videos that Defendants took of the Victims and shared with one another. That was indeed one of the purposes of the Federal warrants—the hope that improvements in technology in the intervening years might uncover the videos. FBI did not mislead a judicial officer

into believing the videos might be on Finkelstein's accounts or devices—indeed, they could have been, and investigators hoped to find them. Finkelstein engaged in a broad conspiracy with Dalya Attar, Joseph Attar, and their co-conspirators. They communicated at length about how to plant secret cameras disguised as smoke detectors to record their Victims. Finkelstein, in particular, instructed his wife, "Plmk how [Victim 1] responds when u tell her we all know :)." FBI absolutely had reason to believe Finkelstein might be in possession of the videos, and Finkelstein has not come close to making a substantial showing that FBI intended to mislead the judge through omission. He has, at best, made a conclusory assertion of recklessness that does not logically follow from the facts.

Investigators had every right to try and find evidence of Defendants' criminality by seeking to locate the illegal recordings Defendants made of their victims—recordings that Defendants discussed, seemingly with pleasure, over Whatsapp. Finkelstein has not made the requisite showing that he is entitled to a *Franks* hearing and his request should be denied.

## I.  CONCLUSION

For these reasons, the United States respectfully requests that the Court deny Defendants' Motions (ECF Nos. 45, 57, 59, and 67).

<div style="margin-left:50%">

Respectfully submitted,

Kelly O. Hayes
United States Attorney


By:  _____
Sean R. Delaney
Reema Sood
Assistant United States Attorneys

</div>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court

via the CM/ECF system, and thereby served counsel for the Defendants on April 30, 2026.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____
Sean R. Delaney
Reema Sood
Assistant United States Attorneys
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800